Good morning. Amanda Bond for the appellants, and I'd like to reserve five minutes for rebuttal. Okay. In 2019, this court held that if plaintiffs proved what we alleged, it would be a naked violation of the antitrust laws that one with even a rudimentary understanding of economics could understand would harm customers. Two summers ago, a unanimous jury found that we proved just that, and the district court's decision to nevertheless grant judgment as a matter of law and summarily deny an injunction was wrong and should be reversed. I'd first like to address the exclusion of Dr. Rasher before turning to the exclusion of two of Dr. Zona's opinions. First, the unexplained exclusion of the NFL tax model, and second, the single competitor model. And then finally, I'll turn to the alternative new trial order and the injunctive relief issue. Okay. Thank you. Beginning with Dr. Rasher, the district court committed at least three fundamental legal errors and an abuse of discretion in excluding the opinions of one of the nation's preeminent sports economists whose expertise in the area of NCAA sports and the intersection of antitrust has been cited by the Supreme Court and this court. First, the district court committed a legal error under Alaska Rent-A-Car when he excluded a yardstick comparison to top-tier college football because of what the court believed to be, quote, significant differences. Under ImageTech and SciUFI, all that is required for a reliable yardstick in the first instance is reasonable economic similarity. And here there can really be no debate that there is reasonable economic similarity between NFL football and top-tier college games. This court recognized the importance of the analogy. The NFL itself compared its own telecasting system to that of, quote, top-tier college football in New Frontier. And Dr. Rasher explained why the similarities are so important. It is not only the same sport played during the same season, but it has- SBA, though. Correct. They don't. And yet that difference was accounted for by Dr. Rasher. Dr. Rasher explained, for instance, that he would expect in NFL football the teams would continue to pull their over-the-air rights because they're allowed to do so by the SBA. He provided sample schedules in which they would continue to do so, and yet there would be competition for the paid television rights. And this was not merely speculation by Dr. Rasher. This was confirmed by the NFL's own New Frontier analysis, where they explicitly contemplated that even if they continued to offer these in-market games on CBS and Fox, there was sufficient demand in the marketplace for the most popular content on television that all of the out-of-market games would still be picked up on basic cable channels. And so this difference was one that Dr. Rasher explained. He took into account in his analysis, and once he did so under Alaska Rent-a-Car, it was for the jury to decide how important that difference was. And perhaps that is why the NFL did not raise this so-called SBA difference as a reason to exclude the yardstick, and the district court's order did not either. Second, the district court committed a further error in requiring Dr. Rasher to project a false certainty about the state of affairs that would have definitively existed in a hypothetical but for world that defendants' misconduct prevented from happening. And in doing so, he not only required something that the field of economics does not require and indeed could not offer, but he contradicted substantive antitrust law dating back to the United States Supreme Court's decisions in Bigelow and J. Truitt Payne that have recognized repeatedly the vagaries of the marketplace usually prevent a plaintiff from saying with precision what would have happened in the but-for world. Here, Dr. Rasher explained the core economic features of the most likely but-for world. Ms. Bonner, I guess with respect, I'm trying to understand the limiting principle in terms of is every yardstick in. Here, your friends have testimony at trial that the networks were not going to play that game, that they were not going to, that but-for world could not exist and they were the very people on whom the but-for world was built. What do we do with that? I think what we do is we say that's a fact question because the jury was free to disbelieve the self-interested testimony of witnesses from Fox and CBS whom the evidence demonstrated were participants in the conspiracy and they could have instead, for instance, credited the NFL's own internal analysis that demonstrated that all the games would be carried. Furthermore, the networks themselves, Fox and CBS, insisted and received a contractual guarantee that DirecTV could not put these games on their basic channels. They had to make Sunday Ticket an add-on premium-priced subscription. Trial Exhibit 750 had Sean McManus from CBS stating explicitly, the concept has always been these packages are sold at a premium, thereby limiting distribution and we are concerned if they are offered for a non-premium price or even free, distribution could grow significantly. A reasonable juror under a Rule 50 standard could have said, you know what? I don't think CBS, Fox, the NFL and DirecTV would have gone to such lengths to make a contractual requirement that these games couldn't be on basic channels unless they all in fact thought there was a reasonable risk that that would happen but for the restraints. Ms. Bond, back on the SBA point, is there, did Dr. Rasher propose any opinion that maintained the league-wide pooling arrangement that seems to be protected by the SBA? Dr. Rasher testified that he was not challenging the league-wide pooling of the over-the-air telecast rights and in fact, he repeatedly stated that the league-wide pooling of free over-the-air telecast rights was protected and he would expect in the but-for world, the teams, if allowed to collude, would continue to. The opinions that he offered were that in a but-for world, they would not have been allowed to also require 100% pooling of the team's separate paid telecast rights and in the absence of that restraint, we can look at what happened in college and within six weeks, these teams were able to rearrange their affairs and the output of telecast shot up dramatically and that's why today, even though college football is second in popularity to the NFL, there is an overwhelming demand that results in sometimes as many as 40 games, 40 college football games being shown over the air nationally and on basic channels and his opinion was that there is no reason to expect that 13 more popular NFL games on Sunday in a similar media market wouldn't have channels of distribution that want to reach the 35 million avid fans and 70 million total fans who are interested in watching these out-of-market games. His opinion was a reliable application of economic methodology assessing the overwhelming demand for these games, the capacity to show them, and he explained in detail why the supposed impediments the NFL pointed to could be overcome and would be overcome because economic bargaining theory predicts that when, as here, production costs are a tiny fraction of the profits to be made, the parties will work those issues out in their negotiations. Finally, the district court committed a third error when he excluded other opinions Dr. Rasher offered that were independent of college football without any reasoning. First, Dr. Rasher offered an opinion that there was yet another yardstick. The NFL itself sells Sunday ticket in Canada where football is similarly popular. Dr. Rasher conducted a regression to show that and yet there is no exclusivity and the result of that is prices are half as much, $149 on cable and $75 on streaming. The district court offered no basis to exclude that opinion which would independently show fact of injury and ability to quantify damages and support the jury's verdict. Second, the district court overlooked and did not mention the fact that Dr. Rasher testified for 20 pages of transcript before ever getting to college football. This is at 7 ER 1122 through 1144. He testified about the overwhelming evidence that the conspiracy to restrict output was accomplished through the explicit mechanism of fixing a quote premium retail price for Sunday ticket. He walked through document after document and he explained how that evidence demonstrated that quote these agreements harmed consumers because the price was higher than it would have been in a competitive situation. That's 7 ER 1143 through 44. That opinion that these premium price agreements to restrict output harmed every class member would independently support the verdict and the district court offered no basis to exclude it. That is an error under this court's higher decision. Unless the court has other questions about Dr. Rasher, I'll turn to Dr. Zona now. Ms. Bond, I guess I'd like to fast forward in your remaining time to the damages question. Why isn't, I mean we have a couple formulations of the standard, but why isn't it sufficiently certain that the jury did what the defendants say that it did? The question I think isn't what they did in terms of what numbers they used. It's the further question why they did it. Let me explain. The jury here reached an estimate of the aggregate damage to the class as a whole. In reaching that reasonable estimate, they did subtract 102 74 from 294. Why might they have done so? Number one, 294 dollars was the price that millions of class members actually paid according to Dr. Zona 9 ER 1598 through 99. What was 102 74? It was not a price that any class member paid according to Dr. Zona. Instead, it was an average calculated in his model that included the paid subscriptions of class members and also the free promotional subscriptions that non-class members received. The NFL injected this number into the trial in opening statement at 4 ER 546 and 557 where they told the jury two things. Number one, they erroneously told the jury this was the price the class actually paid. A statement they later corrected in closing argument. But so the question we're asking here under her cases is whether it was clearly supported by the evidence. I don't think there's any theory that it was based on speculation or guesswork. There was a calculation, again, maybe not certain, but whether it's sufficiently certain. So how is it clearly supported or clearly not supported by the evidence, right? That's the claim. Um, if the NFL disclaims, um, that reading and, uh, it looks an awful lot like the jury assessed damages based on a discount rather than a premium. Um, how can we say that that is sufficiently supported by the evidence? Because the second thing the NFL told the jury was that this was a competitive price that was evidence that there was no restraint and they put finer point on it during the cross examine it cross examination of Dr Zona. They said 102 74 is less than these other sports packages. That number was also within a range of a number of potential. But for prices, the jury heard they heard that ESPN wanted to offer Sunday ticket for $70 but was rejected because that price was too low to protect the networks. They heard that in Canada without exclusivity, Sunday ticket could be purchased for $75 on streaming or 149 on cable. And in deciding amongst them, it would have been perfectly rational for them to have said the NFL itself urged that 102 74 a number in the range of all of these potential but for prices would be a competitive price and therefore the difference between 294 what millions of class members paid and 102 74 a number the NFL itself has urged repeatedly would be a competitive price is an overcharge. They had evidence in the record including Dr Rasher's testimony but also new frontier that would have allowed them to award up to 5.6 billion in damages to the residential class. And if in coming to a consensus about a damages number, they credited the NFL's arguments to discount the damages down to that difference between the price millions paid and a but for price that was within a range of other possibilities and the NFL conceded would be a competitive price. That is a completely rational basis for the jury's award supported by the evidence. Unless the court has other questions, I'd like to just mention the injunction, which might be reversed. The district court denied an injunction summarily, not only without a hearing but without offering any reasoning whatsoever. Here, the violation is continuing. The defendants continue to pool their telecast rights, offer it exclusively through one provider at a higher price than ever, subject to the same contractual restraints with CBS and Fox to protect them from competition by requiring that Sunday ticket be an add-on premium subscription. So the denial of an injunction must be reversed as well. Ms. Bonner, I'm sorry, one question just on that. Is there a possibility that plaintiffs would ask a district court to frame such an injunction, given that the agreements at issue here are no longer in effect? Well, I think here the district court, among other things, could look to the continuing agreements between the teams, the continuing agreements with CBS and Fox, and as the district court itself noted... Those aren't the agreements that you challenged, right? So the problem is the agreements we challenged are an interlocking set of agreements that include the team's agreements to protect CBS and Fox from competition by requiring a premium-priced add-on subscription. As the district court itself noted, the fact that a party that's sitting in the seat of the premium-priced add-on subscription may have changed doesn't deprive the court of the ability to redress the defendant's conduct, the pooling, the exclusivity, the premium-priced agreements with the networks that continue. Thank you. I'll reserve my time. Thank you. We'll give you five minutes on rebuttal. Thank you. I appreciate it. Good morning. Good morning, Your Honors. Paul Clement for the Appellees Cross-Appellants. I'm going to endeavor to save two minutes for rebuttal limited to the cross-appeal, if I may. Your Honors, by rule, the argument section of appellate briefs must start with the standard of review. And for good reason, as in many cases, including this one, the standard of review goes a long way to determining the outcome. Here, most of the issues on this appeal, starting with the decision to exclude plaintiff's experts, are governed by an abusive discretion standard, reflecting the fact that no appellate record can replicate the district court's familiarity with the case and the difficulties each side in the case faced. Here, Judge Gutierrez oversaw a nearly three-week trial and years of pretrial skirmishing. He understood better than anyone that the plaintiffs had a very specific challenge here. They not only needed to show an antitrust violation, but to do so on a class-wide basis, such that they would need to show that every class member suffered a uniform injury and damages that could be readily calculated on a class-wide basis. That was no mean feat in a case like this, where class members purchased Sunday Ticket at different times and different prices and for different reasons. Some because they wanted to watch a particular team but lived outside of that team's home market, and others because they wanted to watch as much football as possible. Now, those are very different customers, and they had very different motivations for purchasing the product. And if you remove pooling and exclusivity, removing that is going to affect those different class members in very different ways. So that's their challenge. Let me have you just go to this yardstick question, because I guess what I'm trying to figure out is, if college football is an inappropriate yardstick, whatever would be in this kind of case? Well, I mean, there would be other potential yardsticks. And, you know, you might start with other sports leagues that are actually governed by the SBA. And so you could start with NBA, you could start with Major League Baseball. Now, to be sure, there's no perfect yardstick. There's no sort of NFL prime. So, you know, you're going to need, if you're going to use a yardstick, you have to make the appropriate adjustments to the differences in the markets. But I think those would have actually been sort of a better starting place, because I really do think the SBA and what it allows is a bit of a fundamental game changer here and really does distinguish the college football market. But I would also say, you know, I'm not here to say that you couldn't possibly find an expert who could put together a coherent model that used college football as the yardstick. I mean, that might be theoretically possible, but it wouldn't be Dr. Rasher or at least wouldn't be Dr. Rasher in this case. And I think the problem, you know, the fundamental problem with Dr. Rasher, and it's evident with the SBA, but it's evident in other respects as well, is every time he was asked, all right, like, how are we going to get, though, from these various but-for worlds to the result that you predict, which is this is all going to be available for free in the sense that it would be part of your basic cable package. Every time he got asked that hard question about every but-for world, his answer was the sophisticated parties will work it out. And that's not an appropriate answer. Well, Mr. Klein, I think it was more than that. As your friend said, with this much money on the table, sophisticated parties will work it out. I'll take the sort of friendly amendment, if you will. But it's not just that they'll work out something. They'll work out that it's all available on basic cable for free. And they did in college football. They did, but without the overhang of the SBA. And in this case, we have no explanation from Dr. Rasher as to how that difference would be accommodated in this situation. And it's a huge difference, right? Because here you start with the protected SBA broadcasts. And so those are broadcasts that have the proprietary markings of CBS and Fox. And what Sunday Ticket does is they take those direct feeds and they make them available in certain markets that don't compete directly with CBS and NBC. What would happen in the but-for world is you might have the possibility of having those feeds go to CBS and Fox's most direct competitors, the other broadcast networks, ABC and NBC. And that's a real difference. And you either have to imagine a world where NBC, whether CBS and Fox are going to willfully give their direct feeds with all of their announcers that they paid for, all of their sort of trademarking. They're going to either give that to their closest rivals or you have to imagine a world where the teams are going to produce or somebody's going to produce a completely different broadcast that's going to bypass that problem. And then you need a theory as to how is that going to be done. Is that going to be available on basic cable or is that going to be some sort of proprietary thing that you have to pay extra for? And remember, what they're imagining is a but-for world where the teams are going to be negotiating individually. And so one seems to be perfectly obvious potential but-for world is a world where the Cowboys just take their available excess games, if you will, the games that aren't going to be showed over the air, and they market them just to out-of-market Cowboys fans. And various teams do that. And those probably wouldn't be available over the air for nothing. And you also might have a situation where, as we suggest... Probably is doing a lot of work in that answer, right? Whether it's impeachable or not isn't the question. This is whether it's admissible. But it's whether he has a reliable theory as to how you get from... Well, why isn't that the end of the inquiry? So we've said that 702 requires a reliable methodology. This is a yardstick methodology. The yardstick chose the only other nationally broadcast football games that we have had in this country for the last several decades, at least on broadcast. I get the SBA point. But to Judge Thomas's question earlier, if that's not a yardstick, what is? I mean, it seems like if the yardstick is the methodology, that's the gatekeeping. Once the methodology is applied, why isn't it all impeachment? It's not all impeachment because you need a reliable yardstick and you also need a reliable method to essentially explain how you get from the but-for world to the conclusion that it's all available for free. Where is any of that in Daubert or Kumho-Tyre in terms of it's a reliable methodology? All of those other things are talking about the substance of the experts' opinions that went to the jury. Well, I think you get it right from Rule 702, particularly after the 2023 amendments. And they specifically clarified that it's not just a reliable methodology. You have to apply the methodology in a reliable fashion. And I want to be clear about this, too, because it's not like Rascher just said the but-for world is college football with continued pooling. He said that was one available but-for world. But he also said, and this is exactly what Judge Gutierrez focused on in finding it unreliable, he also said there was another but-for world which was without pooling. And then he said, then there's the question of do the teams negotiate individually or do they negotiate in groups? And he said they're different but-for worlds with that. And so by the time he's done and then, you know, do they negotiate in groups of six or groups, you know, six groups of four, four groups of six, and all of those are nearly an infinite possibility of different but-for worlds that Dr. Rascher posited. And his explanation for why he could do that is he said we magically essentially, you know, we're lucky here because all of them lead to the same outcome, which is it's all available on basic cable for free. And the problem is with none of those but-for worlds did he show a reliable methodology to get from the but-for world to the result that it's all available, not just in some form, but all available on basic cable for free. And when he's asked about how you do that in all of those situations, he says, well, the sophisticated parties will work it out. And that's why the testimony that Judge Gutierrez relies on in footnote six of his opinion is particularly problematic for Dr. Rascher, because it's not just he found some evidence in the record that contradicted something, it's that Dr. Rascher's answer to every hard question is the sophisticated parties will work it out. Well, footnote six collects the testimony of the sophisticated parties, and the sophisticated parties are saying you can't work this out. This is fundamentally different. We're never going to give our proprietary feeds to our direct competitor broadcasters. That's what he says. Why would it not be proper for the jury to discount that, given that those sophisticated basic economic theory are arguably enjoying super competitive pricing under the umbrella that was proven and the conspiracy that was established? So it would be one thing if they had some fact witness or some model that directly showed this is how you solve that problem. But they didn't. There's nothing there. There's just Rascher saying they'll figure it out. And there's the people he says are going to figure it out, saying this is not a speed bump. This is an insurmountable hurdle in this industry. And it's fundamentally different from giving your feed to direct TV that's going to have it in limited markets to a limited group of consumers. But to give your direct feeds to your fiercest rivals to show over the air or on a basic cable package is something that's just not going to happen. And there's no counter testimony on that for the jury to believe. And again, at the end of the day, I think the question here is, and that's why I started with the standard of review, it's whether Judge Gutierrez abused his discretion in exercising his gatekeeping function to say that this is just a bridge too far here, this yardstick's fundamentally flawed, and I haven't heard an ability for the expert to get over the hump from the but-for world to the result that he's predicting in all of these different scenarios. And so I think he acted well within his discretion in excluding Dr. Rasher, and I'm happy to talk about Dr. Zona as well, but without those experts, as he said, you know, there's really like no ability to prove antitrust injury or damages at that point. And with, I'm sorry. Just the, my fundamental problem with what this, your position is taking all of this from the jury. I know, I mean, juries are imprecise. It's an archaic sort of process we have for resolving disputes. And, you know, as a trial judge, there have been many times I could point to where the jury came to a result that as long as the instructions were valid and correct, then we accept the jury's verdict. So I, you know, this judge, you know, remarkably very soon after the verdict decides to take it away from the jury. Well, I guess what I would say is, you know, he didn't take it away from the jury. It went to the jury. Well, right. And then he, of course, post-trial then decides the Rule 702 issues. And I don't think there's anything wrong with that. I mean, it's no different. I mean, you know, JMALs, as you know, get granted all of the time. And I think there's nothing particularly problematic about a judge who decides, look, I'm going to let this go to the jury, but I have, you know, lingering concerns about the Rule 702 issues, but I'm going to not knock this out on Rule 50A, which he could have done. And then that would really be taking it away from the jury. But what he decided to do is sort of defer. And then he considered these issues again as part of the Rule 50B motion briefing. And then he said, there's a fundamental problem here, and I'm going to exercise my discretion under Rule 702. That doesn't automatically take it from the jury, but he then makes the constituent judgment that without the experts, there's insufficient evidence. So I don't think there's anything wrong. Did the district court anywhere express its lingering concerns after, I think, twice denying the Daubert motion to these experts? He did, actually. And he did it essentially right after these experts testified. And he said, you know, on the, you know, he said on the record that maybe I should have granted those, you know, Rule 702 motions, the Daubert motions. So he said it right then. That was, you know, the plaintiff still had a possibility of putting on a rebuttal case at that point. So they could have called Rasher back up and tried to fix the problem. But I think the problems were fundamentally unfixable. So he did, you know, he did say this in real time, that he was having problems with this. And the other thing I would just say is, to the extent there's any sort of lingering sort of concern about fairness on any of this, I mean, you know, I think the Supreme Court's decision in Weissgram is a complete answer. That's a case where the court approves the possibility of the appellate court reversing on the Rule 702 issue, and then the appellate court, in the first instance, saying there's JMOL is appropriate here without the experts. And Justice Ginsburg's opinion for the unanimous court specifically addressed the sort of fairness concerns of that and said, there's no fairness problem with this. In a post-Daubert world, nobody, like, holds back their really good expert just in hopes that, you know, the first two just by. So, you know, if you can do this on appeal, certainly a trial judge can do it post-trial. And so I just, you know, I hope that's responsive to the concern you raise, because I don't think methodologically there's anything wrong about the way that he handled this. And it ultimately maps on to first question, was he within his discretion to exclude the evidence as unreliable? I would say that's an abuse of discretion, and I would say he acted well within the abuse of discretion. And then it is, you know, it is a matter of law as to whether then he properly entered JMOL with the experts removed from the case. But without the experts in this case, kind of like the rail freight case in the D.C. Circuit, there's very little left once the experts are removed from the case. Could you spend some time on the class certification? I would be delighted. I would be delighted to do that, because, you know, I think that, you know, the class certification would have to fall almost automatically. I think the only reason that Judge Gutierrez didn't sort of reach that issue is because he entered JMOL. And I also think, you know, the standard for making that judgment under Rule 23 is actually kind of less deferential to sort of, you know, the jury and the gatekeeping. I mean, a judge, even in a case where they let the experts in, the judge can still say there's so many problems with these experts that I'm not going to certify this case as a class action. It can still proceed with the individual sort of plaintiffs if they want, but there's so many problems with the class-wide evidence in a case like this that I'm not going to, even though you pass sort of Rule 702, you still don't satisfy the standard for the kind of reliable evidence you need for class certification. I guess the problem there is that the district court did certify the class based on these theories, didn't revisit that, and then provided, after JMOL, provided an alternative new trial. How is that not inconsistent with understanding what the district court did as implicitly decertifying a class? I mean, I just don't, we raised this issue, he just didn't address it one way or another. And, you know, I do think he already was addressing it one conditional sort of motion, so I don't think we can fault him for not sort of addressing everything that any one of the parties sort of raised. So I don't think there's any implicit rejection of this, and I do think it would be within this court's power to sort of consider this on appeal. Well, speaking of that, what about the injunctive relief? So I'm glad you asked. I think on the injunctive relief, that was another thing he didn't expressly address, but it wasn't like he forgot about it. I mean, the plaintiffs specifically said, wait a second, you need to address injunctive relief, and we said, no, you don't, because, you know, this case is effectively over and without antitrust injury, there's no basis for an injunction. And I think that, you know, this court... Well, you reminded him, but is there anything you can point us to that contains the district court's analysis of that question, reaching that question? No. Okay. But I think the analysis of that question is very straightforward, and let me try to do it in 30 against Washington Energy, which we cite in our briefs, that makes crystal clear, both in the majority opinion and in Judge Reinhardt's concurrence, that if you don't prove antitrust injury, you do not get injunctive relief. So that's circuit law. We cite it in our briefs. My friends on the other side don't even respond to it. Now, the only thing they could possibly say is that in some cases, there might be the possibility that you can't prove past injury, but you could prove threatened future injury. But that might be true in some case where there's some, like, new thing that just happened at the end of the class period or something, and your basic theory of the case doesn't address that. But in this case, you know, they challenged a practice that was going on for a decade. And if in doing that, they can't show that there was any actual injury to the class, then they don't get injunctive relief sort of full stop, and I think the Catlin case is circuit precedent that supports that result, if I may reserve. Yeah. Any other questions? Okay. You'll have your full two minutes. Thank you. Thank you. All of the arguments we just heard about why Dr. Rasher's opinion was supposedly too unreliable are all factual questions that were thoroughly aired at trial. I'll give one example on feed sharing where the district court simply chose to credit the testimony of one witness, Sean McManus. At 6 ER 1016, the NFL asked Larry Jones, Mr. McManus's counterpart at Fox, couldn't you have just told the NFL we're not going to share our feeds? And his answer was, I could have said it, it wouldn't have gone anywhere. But you're in a negotiation, you've got to have credibility. You don't want to walk in asking for things you know you're not going to get. A jury hearing this evidence could have concluded that feed sharing was simply a pretext, as demonstrated by the NFL's own new frontier study, where they themselves assessed that networks would share their feeds with other channels and they might just pay less. That's what one would expect when you go to a monopolized, restrained market to one where the restraints are relaxed or lifted. There was no answer for the exclusion of Dr. Rasher's other opinions on the Canadian price or his opinions that the premium price agreement to restrict output harmed the class. All of these issues were aired. The notion that somehow the judge gave warning and we could have cured any of his misconceptions by recalling Dr. Zona is belied by the actual sequence of events at trial where the judge, while Dr. Rasher was on the stand, the morning before his day two testimony, said, I think this is all very interesting, but we'll see what the jury thinks. The first time he raised any concerns with Dr. Rasher or Dr. Zona was in the defense case in chief after he expressed that he was aggravated about how we had cross-examined Roger Goodell, the NFL commissioner, and Mr. Jones, the owner of the Dallas Cowboys. And after doing so, he issued an order saying that we could not put on a rebuttal case at all. And essentially, we begged the court's permission to put on another economist, Einer Elhag. The district court's order and the NFL's brief never addressed the fact that there is a completely independent expert, Professor Elhag, who testified in rebuttal and who the jury was permitted to consider. Would you respond to the argument about it was proper to deny the class? Here, the district court certified the class and he declined to decertify. Either way, the NFL has to show an abuse of discretion. Here, this case was tried because all the evidence was common evidence. There was common class-wide evidence about the pooling agreement, common class-wide evidence about the conspiracy to restrict output, common evidence about how that led to an overcharge because these agreements required that Sunday ticket be an add-on premium at a premium price. Mr. Clement didn't mention a single individualized issue that would somehow predominate over all of these common issues with or without the experts. Maybe I misunderstood him, but I thought he said that it wouldn't be possible to measure the damages. Not so. And let's give some examples. First of all, there was factual evidence in the record. As to the prices that were charged, Dr. Zona explained just a pure observation of the data that most people paid list prices or close to it. He said, quote, there are two observations in the data. There was factual evidence about a range of but-for prices, including that ESPN wanted to offer this for $70. And finally, the jury could rationally conclude, based on the defendant's own testimony, excuse me, CBS and Fox's testimony, that without this requirement that there be an add-on premium subscription, they were concerned it would be offered for free. It would be in their rational economic interest to put it on basic. That would have allowed the jury to compute damages to the class as a whole. On the B-2, the injunctive class issue, I'd asked you before about what an injunction would look like here. How would that work as a class action where the class is defined as purchasers of DirecTV and not NFL fans who are interested in out-of-market games in general? Because these purchasers have a demonstrated history of being interested in watching the out-of-market games. And if the teams, for instance— Why is that close enough? Point me to something that would help me connect those dots. Yeah, because the entire theory of harm here is that but-for these agreements, the games would be on basic channels. They wouldn't have to buy a product at all. They wouldn't have to buy an add-on Sunday ticket. They have TVs. They want to watch the games. And if restrained, more of these games would be available over the air and on basic channels. These are not unwashed masses off the street saying, I would have liked this product hypothetically. These are people with a course of dealing, of buying this product. And if the ongoing conduct is enjoined, those games would be available on their basic channels. I guess even on—correct me if I'm wrong— even on Dr. Rasher's own terms, the theory is that you'd be moving from a world in which everyone, the DirecTV subscribers, would have access to every game nationwide to what exactly? To a sense where conferences negotiate for it. Is there enough there for us to find that every game, the entire DirecTV nationwide package, would be available to every subscriber on those terms and broadcast? Can you help me pin that down in the record? Yes. There's two key pieces of evidence. Number one, Dr. Rasher's yardstick analysis demonstrates that less popular content in terms of college football, there is sufficient demand and capacity for 40 games to be available on Saturdays on those channels. And his opinion is that the 13 games of the NFL, even the Jaguars, he testified, at the time one of the less popular NFL teams, is more popular than the most popular college football game. And that was confirmed by the New Frontier analysis. New Frontier demonstrated that all of the NFL games, there would be a demand to make those games available on channels that were over the air or basic. Now, finally, I'd like to turn to essentially the overall picture in this case. Because really, what's been done here is there's an admitted antitrust violation. The district court doesn't deny it. He didn't issue any reasons for excluding the Zona tax model, which would have alone offered support for the jury's verdict and damages up to $1.39 billion. He excluded the Zona single competitor model based on his assessment of whether streaming was feasible in a but-for world when the jury had ample evidence of streaming of the Super Bowl dating back to 2012, of streaming of other sports. These were questions for the jury. And here... Let me stop you because you're over time. Do either of you have any other questions? Thank you. Okay, thank you very much. Thank you. Go ahead. Thank you. So I want to stick to the cross appeal. And there's really two issues on the cross appeal. One is the class action. And one is whether there would be a new trial limited to damages or a complete new trial. On the class action, the challenge they fundamentally faced is there are real disparate interests in this class. And if you imagine a but-for world where the way it works out is that the Cowboys and the Packers and the other popular franchises market sort of paid packages just to their out-of-market fans, which is a very plausible scenario. Then those fans may be worse off because they may end up paying more for that package. They may pay less. We don't know how much it is. But then the person who bought Sunday Ticket because they wanted to watch as many out-of-market games as possible is materially worse off in that world. And of course, there's another possibility that could happen in the but-for world, which is, and this really accounts for the uniqueness of the SBA. The NFL could simply decide, you know, the Sunday Ticket is sort of the tail on the dog anyways, and it's just not worth the hassle. So we're just going to go with our over-air broadcasts and nothing else or nothing else except at sports bars. And if that happens, almost everybody in the class is worse off. And the only solution to that was it's all going to be free and everybody gets all of their money back. And that solves all the class issues. But if you get rid of Rasher entirely, or even if you think Rasher's just not sufficiently reliable for Rule 23 purposes, then you need to decertify. On the, if we get to the new trial issue, I mean, you know, $191.26 is explicable only by looking at those two numbers. You can quibble about whether 102.74 is per subscriber, per class member. It doesn't matter. It looks to all the naked eye that they took the discount and made it damages. And Judge Gutierrez not only rejected that, but he said, this is my evidence that they didn't follow my instructions. And at that point, he is well within his discretion to order a new trial. And it has to be a new trial on everything because A, he didn't limit the new trial grant under Rule 59, conditional though it was, he didn't limit it to damages. And the second thing is just as a practical matter, there's no way to limit it to damages if you had a retrial consistent with the Seventh Amendment, because we don't know whether the jury found pooling and exclusivity is the problem, just exclusivity. Was it the NFL tax? We have no idea. So you couldn't just tell. Did you raise the Seventh Amendment issue in your briefs? Yes. Okay. It's in our final, I think it's a gray covered sort of surreply or cross appeal reply brief. Okay. Okay. Any other questions? Thank you very much. We thank both counsel for their very helpful arguments in this matter. And this case is submitted. We are in recess until tomorrow morning. Thank you.
judges: THOMAS, JOHNSTONE, Lefkow